UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO. 06-16

AT&T CORP., *doing business as* AT&T, et al.,                                     PLAINTIFFS,

v.                                          **OPINION AND ORDER**

ROBBIE RUDOLPH, et al.,                                                DEFENDANTS.

****    ****    ****    ****

This matter is before the Court on the Motion for Preliminary Injunction (Rec. No. 5) filed by the Plaintiffs; the Motion to Dismiss (Rec. No. 9) filed by the Defendants; and the Motion for Summary Judgment (Rec. No. 19) filed by the Plaintiffs.  For the following reasons the Court will DENY as moot the Plaintiffs' Motion for Preliminary Injunction; DENY the Defendants' Motion to Dismiss; and GRANT in part and DENY in part the Plaintiffs' Motion for Summary Judgment.

I.      **FACTS.**

A.      **KRS § 136.616(3) ("Section 3").**

The Plaintiffs are interexchange telecommunications service providers. With this action, they ask the Court to enjoin enforcement of a particular section of a Kentucky statute, KRS § 136.616(3) ("Section 3"), and to declare that the provision is void and unenforceable because it is preempted by federal law and violates both the First Amendment and the Commerce Clause of the United States Constitution.

KRS §136.616 provides, in relevant part, the following:

(1)     A tax is hereby imposed on the gross revenues received by all providers.

(2)     The tax rate shall be:. . . (b) One and three-tenths percent (1.3%) of the gross revenues received for the provision of communications services, as sourced under the provisions of KRS 139.105, billed on or after January 1, 2006.

(3)     The provider shall not collect the tax directly from the purchaser or separately state the tax on the bill to the purchaser.

KRS §136.616.

In their complaint, the Plaintiffs state that they do not object to any portion of the statute except Section 3 which prohibits them from collecting the newly imposed 1.3% gross revenue tax ("GRT") directly from purchasers and from separately stating the tax on the bill to the purchasers. (Rec. No. 1, Complaint ¶ 5). Pursuant to KRS §136.990(11) (the "Penalty Provision"), any provider who violates Section 3 is "subject to a penalty of twenty five dollars ($25) per purchaser offense, not to exceed ten thousand dollars ($10,000) per month." The Plaintiffs have not specifically asked the Court to enjoin the Penalty Provision either in their Complaint or in their Motion for Preliminary Injunction. Nevertheless, as a practical matter, if Section 3 is held invalid, then the Penalty Provision which sets forth the penalties for failing to comply with Section 3 will likewise be invalid. Furthermore, at the hearing on this matter, Plaintiffs' counsel indicated that they did seek to enjoin the Penalty Provision. (Rec. No. 24, T'script at 4).

Plaintiffs state they want to "pass through the costs of the GRT on the bills they send to Kentucky customers." (Rec. No. 11, Reply at 10). They want to recover the cost of Kentucky's GRT by way of a line-item charge on their Kentucky customers' bills instead of rolling the cost into their customers' rates.

Section 3 explicitly prohibits the Plaintiffs from collecting the GRT "directly from purchasers" by "separately stating the tax on the bill to the purchasers." It does not, however,

2

explicitly prohibit the Plaintiffs from recovering the tax by rolling the cost into the Plaintiffs' rates or otherwise prohibit the Plaintiffs from "indirectly" recovering the cost of the GRT from their Kentucky customers.  In this litigation, the Defendants have never indicated that Section 3 prohibits such activity.  In fact, the Defendants state that Section 3 is "by no means an Anti-Pass-Through Provision." (Rec. No. 10, Defs.' Response at 8).  Thus, Plaintiffs may indirectly recover the cost of the GRT from their Kentucky customers by raising their rates.

       **B.**     **Alleged Effects of Section 3 on Plaintiffs.**

Plaintiffs state that they each offer one or more national single-rate pricing plans.  (Rec. No. 1, Complaint ¶ 29).   They state that their monthly bills to customers lists this national rate for interstate and intrastate telecommunications services. (Rec. No. 1, Complaint ¶ 31). Plaintiffs state they commonly recover the cost of certain state and local taxes and fees through separately stated line-item charges on their customers' monthly bills.  (Rec. No. 5, Plaintiffs' Mem. Supp. P.s.' Motion for Prelim. Inj. at 3).  Plaintiffs state they collect the line-item charges only from customers in the jurisdiction imposing the tax or fee.  (Rec. No. 19, Plaintiffs' Mem. Supp. P.s.' Motion for Simm. J. at 5).

Plaintiffs state that collecting state and local taxes only from customers in the jurisdiction imposing the tax or fee allows the Plaintiffs to maintain a national rate across different state and local tax jurisdictions. Plaintiffs state that recovering the costs of state and local taxes through line-item charges billed only to the customers in the taxing jurisdiction also ensures that only customers living in the taxing jurisdiction pay the tax. Finally, Plaintiffs state that line-item charges for state and local taxes inform their customers about what portion of the customers' total charges is attributed to state and local taxes. (Rec. No. 1, Complaint ¶ 32).

Plaintiffs argue that Section 3's prohibition on line-item charges will force them to recover the cost of Kentucky's new GRT in one of two ways. They can recover the cost from all their customers across the nation by rolling the cost into their national rate. (Rec. No. 1, Complaint ¶ 34). A nation-wide raise in rates would allow the Plaintiffs to keep uniform national rates. However, the Plaintiffs argue, this would also force customers in other jurisdictions to pay Kentucky's new tax while receiving none of the benefits of those taxes. (Rec. No. 1, Complaint ¶ 34).

Alternatively, Plaintiffs state they could recover the GRT cost from only their Kentucky customers by rolling the cost into only the rates of their Kentucky customers. This, however, would destroy the Plaintiffs' national rate plan and require them to offer a specific "Kentucky" rate plan. A "Kentucky" rate plan would cost the Plaintiffs money by requiring them to change their billing and financial reporting systems; to create advertising, marketing and sales materials aimed only at Kentucky; and to train sales and customer care representatives who deal with Kentucky customers. (Rec. No. 1, Complaint ¶ 36).

Plaintiffs argue that Section 3 is preempted by federal law and that it violates the First Amendment and the Commerce Clause. (Rec. No. 1, Complaint ¶ 5).

## II.    DEFENDANTS' MOTION TO DISMISS (Rec. No. 9).

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint should not be dismissed. . . unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz v. Beto*, 405 U.S. 319, 322 (1972)(citation omitted). "[T]he factual allegations in the complaint must be regarded as true. The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d

434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)).

The Defendants move to dismiss Plaintiffs' complaint on the grounds that the action is barred by the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341.   The TIA prohibits district courts from enjoining, suspending or restraining the "assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.

Plaintiffs argue that they do not seek to enjoin or restrain the assessment, levy or collection of the GRT. (Rec. No. 12, Plaintiffs' Response at 3).  Instead, Plaintiffs state that they only object to Section 3 which prohibits them from collecting the tax directly from the purchaser or separately stating the tax on the bill to the purchaser.  Thus, the Plaintiffs argue,  the TIA does not prohibit their action in federal court. In support of their argument, Plaintiffs cite *Hibbs v. Winn*, 542 U.S. 88 (2004).  In that case, in determining the scope of the TIA, the Court noted that:

> the Senate Report commented that the Act had two closely related, state-revenue-protective objectives: (1) to eliminate disparities between taxpayers who could seek injunctive relief in federal court – usually out-of-state corporations asserting diversity jurisdiction – and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later; and (2) to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances.

*Id.*  at 104.

The Court determined that, in enacting the TIA, "Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority. Nowhere does the legislative history announce a sweeping congressional direction to prevent 'federal-court interference with all aspects of state tax administration.'" *Id*. at 105.

Though Plaintiffs challenge Section 3, they have continuously paid the GRT.  Thus, even if the Court should grant the requested injunction, the Defendants will receive every dollar of the tax. Enjoining the enforcement of Section 3 will not disrupt the state's collection or receipt of the tax or otherwise disrupt state government finances.

Defendants argue that enjoining Section 3 would interfere with the state's collection of the tax because the prohibitions contained in Section 3 make clear that the Plaintiffs are the parties legally responsible for paying the new tax.  The Defendants state that, if the Plaintiffs are allowed to separately state the tax on their customers' bills, the Plaintiffs' customers will believe they are the taxpayer which will cause refund claims and other challenges to the tax by individuals who do not have legal standing to bring the claims.

Even assuming that the Plaintiffs' customers will believe they are responsible for paying the newly imposed GRT, such a misapprehension would not affect the state's ability to collect the GRT. The Plaintiffs are the parties responsible for paying the tax.  The Plaintiffs clearly understand that and, in fact, are currently paying the tax.  Thus, enjoining Section 3 would not interfere with the state's collection of the tax from the parties responsible for paying it.

Defendants appear to argue that this act is barred by the TIA because enjoining Section 3 *may* ultimately cost the state money because some purchasers of interexchange services *may* think they are responsible for paying the tax and then *may* bring suit to challenge the tax or get a refund and the state would have to spend money to defend those actions.  Again, however, the TIA " proscribes interference only with those aspects of state tax regimes that are needed to produce revenue – *i.e.,* assessment, levy, and collection." *Hibbs*, 542 U.S. at 105 n. 7.  The TIA does not bar all injunctions that may ultimately cost the state money.

6

Defendants also argue that the Plaintiffs' action is barred by the TIA because the Plaintiffs seek to enjoin the Penalty Provision at KRS § 136.990(11) which imposes a monetary penalty on any provider who violates Section 3. In support of their argument, Defendants cite *Darne v. Wisconsin*, 137 F.3d 484 (7th Cir. 1998). In that case, the plaintiff challenged a section of the Wisconsin tax code which assessed a tax penalty for early withdrawal of retirement funds. 137 F.3d at 486. Accordingly, the case fell within the TIA's "undisputed compass." *Hibbs*, 542 U.S. at 106. The case involved a plaintiff "who mounted federal litigation to avoid paying state taxes. . . Federal-court relief, therefore, would have operated to reduce the flow of state tax revenue." *Id.*

In this case, the Plaintiffs do not challenge the tax and are, in fact, paying the tax. They only challenge Section 3, which restricts how the Plaintiffs may recover the tax and how they may present the tax on their customers' bills, and the penalties for violating Section 3. Thus, the TIA is not an impediment to this Court's jurisdiction in this case. Accordingly, the Motion to Dismiss will be DENIED.

## III.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Rec. No. 19).

The Plaintiffs have filed motions for preliminary injunction and summary judgment. (Rec. Nos. 5 and 19). With their Motion for Summary Judgment, the Plaintiffs rely on the same arguments made in their Motion for Preliminary Injunction. Likewise, the Defendants rely on the same arguments in responding to both motions. Defendants have not requested additional time for discovery to respond to the Plaintiffs' Motion for Summary Judgment. Moreover, after reviewing the pleadings, the Court finds that there are no disputed issues of fact in this matter and that the issues raised in the Plaintiffs' motions may be finally decided as a matter of law without the need for discovery or a trial.

7

Accordingly, this matter being ripe for summary judgment, the Court will deny the Plaintiffs' Motion for Preliminary Injunction as moot and will instead address only the Plaintiffs' Motion for Summary Judgment. Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A.      **Plaintiffs' Dormant Commerce Clause Claim.**

Plaintiffs argue that Section 3 violates the dormant Commerce Clause because it discriminates against or unduly burdens interstate commerce. (Rec. No. 1, Complaint ¶¶ 59-60). The Commerce Clause of the United States Constitution authorizes Congress to "regulate Commerce. . . among the several States. . . ." U.S. Const. art. I, § 8 cl. 3. "[T]he very purpose of the Commerce Clause was to create an area of free trade among the several States." *Westinghouse Electric Corporation v. Tully*, 466 U.S. 388, 402 (1984)(citation omitted). Thus, "[a]lthough the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Dev. Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).

States are prohibited from discriminating against interstate commerce which "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Ore.*, 511 U.S. 93, 99 (1994). This is because, "[p]ermitting the individual States to enact laws that favor local enterprises at the expense of out-of-state businesses would invite a multiplication of preferential trade areas

8

destructive of the free trade which the Clause protects." *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 329 (1977). Such a result would be contrary to the fundamental objective of the dormant Commerce Clause which is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997).

A statute can discriminate against out-of-state interests in three different ways: (1) it may be facially discriminatory; (2) it may have a discriminatory intent; or (3) it may have a discriminatory effect. *Amerada Hess Corp. v. Director, Division of Taxation, New Jersey*, 490 U.S. 66, 75 (1989); *Eastern Ky. Resources v. Fiscal Court of Magoffin County*, 127 F.3d 532, 540 (6th Cir. 1997)(citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992)).

**1)      Plaintiffs' Dormant Commerce Clause Claim.**

Plaintiffs do not allege that Section 3 facially discriminates against out-of-state interests. The language of the provision does not distinguish between in-state and out-of-state economic interests or residents. Instead, it evenhandedly applies to all providers. Accordingly, "there is no explicit discriminatory design to the tax." *Amerada*, 490 U.S. at 76. Neither do Plaintiffs allege that Section 3 has a discriminatory purpose. "The party challenging the validity of the regulation has the burden of demonstrating that the regulation has a discriminatory purpose." *Id*. Plaintiffs have presented no evidence that the Kentucky legislature's intent in enacting Section 3 was to protect local economic actors or to economically isolate the Commonwealth from the rest of the nation, *Eastern Ky. Resources*, 127 F.3d at 542, or that the legislature was "motivated by an intent to confer a benefit upon local industry not granted to out-of-state industry." *Amerada*, 490 U.S. at 76.

Plaintiffs argue that Section 3 has a discriminatory effect. They do not argue, however, that

Section 3 has a discriminatory effect on out-of-state telecommunications providers. Instead, they argue that Section 3 has a discriminatory effect on their out-of-state customers. Specifically, Plaintiffs argue that Section 3 has the effect of requiring non-Kentucky citizens to help pay Kentucky's newly imposed gross revenue tax without receiving any of the benefits from the tax revenues. (Rec. No. 1, Complaint ¶ 63-64). This is because, in order for the Plaintiffs to recover the cost of the tax from Kentucky customers without giving up their national rates, the Plaintiffs will have to raise their rates nationwide. Thus, the Plaintiffs' customers in Kentucky and outside of Kentucky will pay for the GRT but those outside of Kentucky will not receive any of the benefits from the state's spending of the tax revenues.

In their Reply brief, Plaintiffs clarify that "it is the discriminatory impact on non-Kentucky *customers*, rather than on Plaintiffs as service providers" that Plaintiffs allege violates the dormant Commerce Clause. (Rec. No. 11, Reply at 11). At the hearing on this matter, Plaintiffs further explained their dormant Commerce Clause claim stating that, "[i]f you lived in Indiana and I lived in Kentucky and I increased the rates to recover the Kentucky tax and that increases your rate as well, then you are being discriminated against versus the Kentucky customer." (Rec. No. 24, T'script at 15).

    **2)**    **Standing.**

An initial issue is whether the Plaintiffs have standing to assert a dormant Commerce Clause claim on behalf of their out-of-state customers. Article III of the U.S. Constitution provides that the subject matter of federal courts is limited to "Cases" and "Controversies." U.S. Const. Art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing "is

the threshold question in every federal case, determining the power of the court to entertain the suit."

*Warth v. Seldin*, 422 U.S. 490, 499 (1975). "In the absence of standing, a court is not free to opine

in an advisory capacity about the merits of a plaintiff's claims." *Bochese v. Town of Ponce Inlet*, 405

F.3d 964, 974 (11th Cir.), *cert. denied*, – U.S. – , 126 S.Ct. 377 (2005).

A federal court presumes that it lacks jurisdiction "unless the contrary affirmatively appears

from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991)(quotations and citation omitted). The

party seeking federal jurisdiction bears the burden of proving each element of standing. *FW/PBS*,

493 U.S. at 231. The Plaintiff must establish both "constitutional" and "prudential" standing. *Elk*

*Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504

U.S. at 560.

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) actual or
> imminent, not conjectural or hypothetical. Second, there must be a causal connection
> between the injury and the conduct complained of – the injury has to be fairly
> traceable to the challenged action of the defendant, and not the result of the
> independent action of some third party not before the court. Third, it must be likely,
> as opposed to merely speculative, that the injury will be redressed by a favorable
> decision.

*See Id*. at 560-61 (quotations, citations and footnote omitted).

The purpose of this inquiry is to determine whether the parties have "alleged such a personal

stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends for illumination of difficult

constitutional questions." *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438

U.S. 59, 72 (1978)(citation omitted).

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of

11

prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of State, Inc.*, 454 U.S. 464, 474 (1982). These principles have developed from "general prudential concerns about the proper – and properly limited – role of the courts in a democratic society." *Duke Power Company*, 438 U.S. at 80 (citations and quotations omitted). Prudential standing "encompasses the general prohibition on a litigant's raising another person's legal rights, the rules barring adjudication of generalized grievances. . . and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Elk Grove*, 542 U.S. at 12 (quotations and citation omitted).

Thus, while constitutional standing focuses on whether the plaintiffs have alleged an "injury in fact" that is a sufficiently concrete interest in the outcome of their suit to make it a case or controversy under Article III, prudential standing focuses on whether the plaintiffs are the "proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff*, 428 U.S. 106, 112 (1976). The Sixth Circuit has explicitly rejected the argument that prudential standing requirements can be waived by the parties. *Community First Bank v. Nat'l Credit Union Admin*., 41 F.3d 1050, 1053 (6th Cir. 1994). "Instead, [standing] is a qualifying hurdle that plaintiffs must satisfy even if raised *sua sponte* by the court." *Id*.

Plaintiffs have established constitutional standing. Section 3 has injured them by prohibiting them from separately stating the GRT on their customers' bills as they would like to do and this injury would be remedied by the requested injunctive relief. As to prudential standing, while the Supreme Court's prudential standing principles impose a "general prohibition on a litigant's raising another person's legal rights," *Allen v. Wright,* 468 U.S. 737, 751 (1984), there is an exception where a "close relationship" exists between the litigant and the third party whose rights he seeks to assert

12

and where there is a "hindrance" to the third party's ability to protect his own interests. *Kowalski v. Tesmer,* 543 U.S. 125, 130 (2004). The Supreme Court has recognized such a relationship between vendors and their customers. *See Craig v. Boren,* 429 U.S. 190, 192-197 (1976)(holding that beer vendors have third-party standing to raise the constitutional rights of their male customers).

"[I]f the litigant asserts only the rights of third parties, then he may satisfy the zone of interests requirement by reference to the third parties' interest if the court determines both that the litigant has third party standing and that the third parties' interests fall within the relevant zone of interests." *Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 811-12 (D.C.Cir.1987) (citing *FAIC Secs., Inc. v. United States,* 768 F.2d 352, 358 (D.C.Cir.1985)).  The Plaintiffs assert that their non-Kentucky customers are injured because they will have to pay higher rates for communications services to pay for Kentucky's GRT but will receive none of the benefits of the tax. The Court need not decide whether the necessary relationship exists between the Plaintiffs and their customers to permit the Plaintiffs to assert this claim.  This is because the alleged injury of the out-of-state consumers  does not fall within the zone of interests protected by the dormant Commerce Clause.

> **a)**    **Consumer Injuries Falling within the Zone of Interests Protected by the Dormant Commerce Clause.**

Consumers have standing to raise a dormant Commerce Clause claim where they are injured *as a result of unconstitutional discrimination against interstate commerce*.  For example, where an in-state consumer is forced to pay a state tax for products produced by out-of-state companies but not for the same product produced by in-state companies, the consumer's injury falls within the zone of interests protected by the dormant Commerce Clause. In *General Motors v. Tracy*, 519 U.S. 278 (1997), the Supreme Court made clear that:

[C]ognizable injury from unconstitutional discrimination against interstate commerce

13

does not stop at members of the class against whom a State ultimately discriminates, and customers of that class may also be injured, as in this case where the customer is liable for payment of a tax and as a result presumably pays more for the gas it gets from out-of-state producers and marketers.

*Id.* at 286.

Thus, in-state customers injured as a result of discrimination against their out-of-state vendors have standing to bring a dormant Commerce Clause claim. Likewise, out-of-state consumers who must pay more for an in-state product than their in-state counterparts are also injured in a manner protected under the dormant Commerce Clause. *Maryland v. Louisiana*, 451 U.S. 725 (1981)(statute which effectively imposed "first use" tax only on out-of-state purchasers of natural gas from Louisiana processing plants violates dormant Commerce Clause).

Further, an out-of-state consumer whose access to in-state goods has been restricted is injured in a manner protected by the dormant Commerce Clause. *See New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982)(New Hampshire statute prohibiting unauthorized sales of hydroelectric energy generated in New Hampshire to out-of-state consumers violates the dormant Commerce Clause); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 578 (1997)(Maine statute granting tax exemption for property owned by charitable institutions but providing that the tax exemption was more limited where the charity operated principally for nonresidents than where the charity operated principally for the benefit of Maine residents violates dormant Commerce Clause because it provides a "strong incentive for affected entities not to do business with nonresidents").

Conversely, an in-state consumer whose access to out-of-state goods has been restricted has been injured in a manner protected under the dormant Commerce Clause. *See Huish Detergents, Inc. v. Warren County, Kentucky*, 214 F.3d 707, 710-11 (6th Cir. 2000)(waste generator subject to local

14

regulation requiring it to send all of its waste to designated facility for processing had standing under the dormant Commerce Clause because it sought "to protect its right to contract with a company that can transport its waste for out-of-state processing and/or disposal").

      b)      **Plaintiffs' Out-of-State Consumers are not Injured in a Manner Protected under the Dormant Commerce Clause.**

Plaintiffs do not allege their non-Kentucky customers will be injured because Section 3 discriminates against the Plaintiffs as out-of-state vendors. Plaintiffs do not allege that their out-of-state consumers must pay more for an in-state product than their Kentucky customers. Plaintiffs do not allege that Section 3 restricts their out-of-state consumers' access to in-state goods or that it deters in-state companies from doing business with their out-of-state consumers. Instead, Plaintiffs allege that their out-of-state consumers are injured by Section 3 because, if Plaintiffs choose to recover the cost of Kentucky's GRT by raising the rates of all their customers, then the out-of-state consumers will help pay for the Kentucky tax without receiving the benefits of the state tax revenue.

Plaintiffs cite *Shell Oil Co. v. New York State Tax Comm'n*, 458 N.Y.S.2d 938 (App. Div. 1983). In that case, the New York court reviewed a statute that imposed a gross receipts tax on certain oil companies in the amount of 2% of their New York gross receipts from the sale of all of their products. *Id*. at 941. The statute also prohibited the gross receipts tax from being "included, directed or indirectly, in the sales prices of its products" sold in New York. *Id*. The oil companies were required to file with their tax a report certifying under oath that they had not included the tax in the sales price of their products sold in New York. *Id*.

With regards to the oil companies' challenge to the anti-pass through provision, the court determined that the companies would "attempt to recoup the cost of the tax on New York sales at the expense of non-New York purchasers of their products." *Id*. at 945. The court then determined

that the "practical effect of the prohibition is to shift the direct burden of the tax from the companies' New York customers to their out-of-state customers." *Id*. at 946.

The statute at issue in *Shell Oil* prohibited the oil companies from recovering the cost of the gross receipts tax either directly *or* indirectly from New York customers. The statute explicitly prohibited the companies from rolling the price of the GRT into their sales prices on products sold in New York.  The New York court thus assumed the companies would recover the tax by rolling it into the sale price of products sold to their non-New York customers.

 In this case, Section 3 only prohibits the telephone companies from *directly* recovering the GRT from their Kentucky customers by way of a separately stated charge on their customers' bills. Section 3 permits telephone companies to recover the cost of the GRT by either raising all of their customers' rates (including Kentucky customers) or by raising the rates of only their Kentucky customers. Thus, Kentucky consumers are not shielded from paying more for telecommunications services than out-of-state consumers.

Plaintiffs argue that Section 3 unconstitutionally discriminates against interstate commerce not because it results in local consumers paying less for out-of-state goods than out-of-state consumers, as was the case in *Shell Oil*.  Instead, Plaintiffs complain that Section 3 is discriminatory because their out-of-state consumers – who will pay the same price for the Plaintiffs' out-of-state goods as their Kentucky counterparts – will not receive any of the benefits of Kentucky's increased tax revenue. This is not an injury protected under the dormant Commerce Clause.  If it were, then anytime a state imposed a sales tax on local sales, out-of-state purchasers could complain that the sales tax violated the dormant Commerce Clause.  Likewise, to the extent that companies like the Plaintiffs average the cost of state-imposed property taxes or income taxes among all their customers

16

nationwide, then their out-of-state consumers could allege that the state-imposed property tax and income taxes violate the dormant Commerce Clause.

Thus, the Plaintiffs' out-of-state customers would lack prudential standing to assert a dormant Commerce Clause claim on the basis that they help pay the cost of Kentucky's GRT but do not receive any of the benefits. Accordingly, the Plaintiffs lack third-party standing to assert such a claim on their out-of-state customers' behalf.

### 3) Merits of Plaintiffs' Dormant Commerce Clause Claim.

To the extent that the Plaintiffs would have third-party standing to assert a dormant Commerce Clause claim on behalf of their non-Kentucky customers, they have failed to state a claim upon which relief can be granted. For the reasons discussed above, Section 3 does not unconstitutionally discriminate against interstate commerce simply because it may result in Plaintiffs recovering the costs of Kentucky's GRT from their out-of-state and in-state customers alike even though the out-of-state customers will not benefit from the tax revenue.

Kentucky has imposed a GRT on telecommunications providers taxing the revenues they receive for furnishing communications services in Kentucky. As the Supreme Court stated in *American Trucking Ass'ns, Inc. v. Mich.*, 545 U.S. 429, 434 (2005), this tax "does not reflect an effort to tax activity that takes place, in whole or in part, outside the State. Nothing in our case law suggests that such a neutral, locally focused fee or tax is inconsistent with the dormant Commerce Clause."

Plaintiffs argue that, if every state passes a similar law, then their cost of business – and thus their rates – in every state would rise. This may be true but this would happen "only because [Plaintiffs] engage[] in *local* businesses in all those States. An interstate firm with local outlets

17

normally expects to pay local fees that are uniformly assessed upon all those who engage in local business, interstate and domestic firms alike." *Id*. at 438.

Furthermore, Section 3 does not require the Plaintiffs to recover the GRT by raising the rates of their out-of-state customers.  Plaintiffs may also recover the cost of the GRT by raising the rates of only their Kentucky customers.  It is true that Section 254(g) requires the Commission to adopt rules requiring that "a provider of interstate exchange telecommunications services shall provide such services to its subscribers in each State at rates no higher that the rates charged to its subscribers in any other State."  In its Section 254(g) rulemaking, however, the Commission stated that "[w]e do not believe that Section 254(g) requires carriers to assess geographically averaged state and local gross-receipts taxes.  Accordingly, we will permit carriers to recover on a de-averaged basis state-specific gross-receipts taxes applicable to interexchange services." *Id*. at 9571 ¶ 12 (1996).  Thus, the Communications Act permits the Plaintiffs to recover the cost of the Kentucky GRT by rolling it into the rates of only their Kentucky customers. Accordingly, even if a state statute prohibiting companies from recovering a state GRT from in-state customers could be said to unconstitutionally burden interstate commerce, Section 3 does not contain such a prohibition.

### 4)    Conclusion.

For all of these reasons, Plaintiffs are not entitled to a ruling that Section 3 unconstitutionally discriminates against interstate commerce and Section 3 should not be enjoined on that basis.

## B.    First Amendment.

 The First Amendment provides that "Congress shall make no law. . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const., amend. I.

**1)**     **A Line Item Charge is "Speech."**

Defendants first argue that it is "questionable" whether the conduct in which the Plaintiffs wish to engage, i.e., separately stating the GRT on their customers' bills, is "speech" protected by the First Amendment. (Rec. No. 10, Defendants' Response to Mot. for Prelim. Inj. at 6). Plaintiffs wish to "pass[] through the 1.3% Kentucky GRT to their customers through a written line item placed on the customers' bills that would notify customers of the origin and amount of the charge." (Rec. No. 1, Complaint ¶¶ 51). Plaintiffs state that "line-item charges. . .provide carriers a timely and effective means of informing their customers what portions of their total bill are attributable to taxes." (Rec. No. 19, P.s.' Mem. Supp. P.s.' Mot. for Simm. J. at 1). Accordingly, the Plaintiffs wish to use written words on their customers' bills to convey a message.

"In general, words communicating information are 'speech' within the meaning of the First Amendment, whether or not the words convey important ideas." *Giebel v. Sylvester*, 244 F.3d 1182, 1186-87 (9th Cir. 2001). That line items communicate information is made clear by the Defendants' argument that the Plaintiffs wish to use the line item to convey *misleading* information. The Plaintiffs will convey certain information by placing a line item on their customers' bills and, thus, will engage in "speech."

**2)**     **Section 3 Does not Survive Intermediate Scrutiny.**

Defendants next argue that a line item on a utility bill is "commercial speech." Commercial speech is defined as "expression related solely to the economic interests of the speaker and its audience," or as "speech proposing a commercial transaction." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 561-62 (1980). It is well established that political speech is entitled to greater protection than "commercial speech." *Central Hudson*, 447 U.S. at 563.

19

The Court has been unable to locate any cases that specifically determine whether information a company presents on its consumer bills is commercial speech. The parties have cited no such cases. Plaintiffs cite *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530 (1980) and *Pacific Gas and Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986), both of which involved restrictions upon written materials included in a company's billing envelope. In both cases, the Supreme Court analyzed the restrictions as content-based restrictions and not as restrictions on commercial speech. *Consolidated Edison*, 447 U.S. at 540; *Pacific Gas and Elec. Co.*, 475 U.S. at 8-9.

Neither *Consolidated Edison* nor *Pacific Gas*, however, involved speech on a company's bills. Instead, both dealt with other matter included in a company's billing envelope. *Consolidated Edison* dealt with an order by the New York Public Service Commission that prohibited utilities from including in their monthly bills inserts expressing "their opinions or viewpoints on controversial issues of public policy." *Consolidated Edison*, 447 U.S. at 532-33. *Pacific Gas* dealt with a California Public Utilities Commission order requiring that Pacific Gas and Electric Company include a newsletter from a consumer group in the company's billing envelope. 475 U.S. at 4. Thus, both cases dealt with speech more extensive than that included in a line-item charge on a company's bill.

In its Truth-in-Billing rulemaking, the Commission assumed without specifically addressing the issue that speech on telephone company bills is "commercial speech." *In the Matter of Truth-in-Billing and Billing Format*, 14 F.C.C.R. 7492 at 7530 ¶ 60 (1999). In that action, the Commission decided to require carriers to "identify line item charges associated with federal regulatory action through a standard industry-wide label and provide full, clear and non-misleading descriptions of the

nature of the charges. . . ."  *Id*. at 7523 ¶ 50.  In determining whether standardized labels would

violate the First Amendment, the majority analyzed the action under  the "commercial speech" test.

*Id.* at 7530-31 ¶ 60.  Nevertheless, in a strongly worded dissent, Commissioner Furchtgott-Roth,

stated that he found the speech to be "intensely political."  *Id*. at 7589.

> The facts of this case involve language on a telephone bill and thus, at first blush,
> might be considered purely commercial. But if one looks closer, it becomes clear that
> this speech does far "more than propose a commercial transaction." *Pittsburgh Press
> Co. v. Human Relations Comm'n*, 413 U.S. 376, 385 (1973). Nor does it constitute
> "expression related solely to the economic interests of the speaker and its audience."
> *Central Hudson*, 447 U.S. at 561. Rather, the speech at issue -- brief descriptions of
> the origin and purpose of universal service charges -- attempts to identify to the
> consumer the cause and intended use of these charges. Accountability for charges that
> some consider a tax is not just a business matter, but a highly political one. Neither
> the government nor the telephone industry wants to be viewed by the public as the
> perpetrator or beneficiary of these new federally-related charges: for carriers it may
> be bad public relations, but for government officials it is bad politics. Few politicians
> welcome the opportunity to be associated with a new tax.

*Id*.  at 7589.

In *Bloom v. O'Brien*, 841 F.Supp. 277 (D. Minn. 1993), the district court analyzed whether

the First Amendment was violated by a state statute which imposed a two percent gross revenue tax

on health care providers and prohibited them from separately stating the tax on bills provided to

individual patients.  *Id*. at 278.  The Court determined that "the itemized bill is indisputably part of

a commercial transaction but it does not propose a transaction as such.  A bill is not a proposal that

the patient pay for services already rendered, it is a demand for payment. . . The speech involved

concerns, but does not propose, a transaction." *Id*. at 281.

"Because this charge is not imposed by the state on the particular transaction, but is a

consequence of the gross revenue tax law, stating the amount charged to individual patients may well

be construed as a political statement about the law as well as a commercial statement about what is

owed. Thus, the proscribed speech may be political speech." *Id.* In the end, the court deferred deciding whether the speech at issue was political or commercial until a trial on the merits and analyzed the speech under *Central Hudson* for purposes of deciding whether a preliminary injunction was warranted. *Id*.

In this case also, the Court need not decide whether Section 3 restricts commercial speech or political speech because the provision cannot withstand even the intermediate scrutiny applied to commercial speech. In *Central Hudson*, the Supreme Court set forth the test for determining whether a particular commercial speech regulation is constitutionally permissible. Under that test, the Court must ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. *Central Hudson*, 447 U.S. at 566. If so, then the speech is not protected by the First Amendment. If the speech concerns lawful activity and is not misleading, however, the court must next ask "whether the asserted governmental interest is substantial." *Id.,* at 566. If it is, then the Court must "determine whether the regulation directly advances the governmental interest asserted," and, finally, "whether it is not more extensive than is necessary to serve that interest." *Id.* Each of these last three inquiries must be answered in the affirmative for the regulation to be found constitutional.

    a)    **Line Items are not Necessarily Misleading.**

The government argues that a line item charge for the GRT is misleading commercial speech because consumers will think the line item describes a government-imposed tax that the consumers are responsible for paying. Thus, the government argues, the line item is not protected under the First Amendment. (Rec. No. 10, Defs.' Response to Mot. for Prelim. Inj. at 7-8). The Defendants, however, have offered no evidence that line items are inherently misleading.

22

The Commission has stated that there is no general prohibition against the use of line items on telephone bills under either the FCC's rules or the Communications Act. *In the Matter of Truth-in-Billing Format*, 20 F.C.C.R. 6448, at 6459 ¶ 23.  In fact, the Commission has stated that accurate and non-misleading line items "may be useful information to the consumer in better understanding the charges associated with their service and making informed costs comparisons between carriers." *Id.*

Section 3 does not simply prohibit misleading line items.  It prohibits all line items, whether the line item contains an accurate description of the associated charge and whether it contains useful information to the consumer. The Defendants have produced no evidence that all line items are misleading.  Accordingly, Section 3 does not prohibit only misleading speech. It prohibits speech which is protected under the First Amendment.

**b)     Government has Substantial Interest in Preventing Confusing Line Items.**

The next issue is whether the government has asserted a substantial government interest in prohibiting telephone companies from separately stating the GRT on its consumer bills.   The government argues that the state has a substantial interest "that the nature and legal incidence of its tax be accurately conveyed and legally secured." (Rec. No. 10, Defs.' Response at 8).  They argue that Section 3 is intended to clarify that the legal incidence of the gross revenue tax rests upon the provider and not the customer. (Rec. No. 10, Defs.' Response at 5). "The provider is thereby unmistakably identified as the party, and the only party, who has the legal right to litigate any issue as to the tax's applicability or validity."  (Rec. No. 10, Defs.' Response at 6). The government has a substantial interest in preventing confusion regarding the party responsible for paying a particular tax.

    **c)**    **Section 3 Does Not Directly Advance Government's Interest in Preventing Confusing Line Items.**

The next issue is whether Section 3 directly advances the asserted governmental interest.  A regulation does not pass this test "if it provides only ineffective or remote support for the government's stated purpose" or if it "only indirectly advance[s] the state interest involved." *Central Hudson*, 447 U.S. at 564.  The government must prove that the challenged regulation "advances the Government's interest 'in a direct and material way.'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)(citation omitted). That burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id*. (citation omitted)

As noted, Section 3 prohibits any itemization of the GRT on consumer bills, whether the line item contains accurate information or not. Prohibiting accurate and informative information in a line item does not advance the government's interest in prohibiting confusion regarding the liability for a particular state tax.

    Further, as the government has stated, Section 3 allows  telephone companies to tell consumers anything they wish about the GRT in flyers, brochures and other communications in their billing envelopes.  (Rec. No. 10, Response at 4, 8).  If inclined to disseminate misleading information, Plaintiffs could disseminate much more such information in brochures and flyers than in a single line item. *See e.g., Rubin*, 514 U.S. at 488 (holding that exceptions to labeling ban on beer alcohol content for other kinds of alcohol rendered scheme irrational); *Valley Broadcasting v. FCC*, 107 F.3d 1328, 1334 (9th Cir. 1997)(holding that exceptions to casino advertising ban for other kinds of gambling undermined purpose of ban).

24

The fact that the statute permits misleading information in every form except a line item precludes Section 3 from directly and materially advancing the state's purported interest in preventing misleading information about the GRT.

      **d)**       **Section 3 is Substantially Excessive.**

The final step in the *Central Hudson* analysis requires the Court to determine whether there is a "reasonable fit" between the regulation of commercial speech and the state's interest. The state bears the burden of affirmatively establishing the "reasonable fit." *Bd. of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989). The state must show that the regulation is proportional to the interest served. *Id.* A regulation which is "substantially excessive" is unconstitutional. *Id.* at 479. "A regulation need not be 'absolutely the least severe that will achieve the desired end.'" *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)(quoting *Fox*, 492 U.S. at 480). However, "if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *Id.*

Section 3 prohibits substantially more speech than necessary to advance the government's interest in preventing Kentucky citizens from being misled as to their liability for the GRT. Section 3 contains a total prohibition on line item charges associated with the GRT.  Again, the government has produced no evidence that a line item is inherently misleading and the FCC has determined that line items may convey accurate and helpful information.

Further, if the government's interest is preventing misleading information, the government could have prohibited only misleading information. For example, the Commission's Truth-in-Billing rules provide that, "[c]harges contained on telephone bills must be accompanied by a brief, clear,

25

non-misleading, plain language description of the service or services rendered."  47 C.F.R. § 64.2401(b).

The Commission has stated that "it is a misleading practice for carriers to state or imply that a charge is required by the government when it is the carriers' business decision as to whether and how much of such costs they choose to recover directly from consumers through a separate line item charge."  *In the Matter of Truth-in-Billing and Billing Format*, 20 F.C.C.R. at 6461 ¶ 27.  Carriers are therefore prohibited from using "misleading statements and descriptions" and from placing charges on a bill " in such a way as to lead a reasonable consumer to believe that the charge has been mandated by the government."  *Id.*  Thus, for example, carriers are prohibited from placing a discretionary charge in a section or subsection of the bill that otherwise contains only government required charges or taxes because this may lead a reasonable consumer into believing that the discretionary charge is also required. *Id*.

If the state's goal is to prevent misleading information on telephone bills, instead of broadly prohibiting any line item associated with the GRT, the government could have adopted a regulation consistent with the Commission's Truth-in-Billing regulation. Furthermore, if any Plaintiff employs misleading information in describing the GRT or the party legally responsible for paying it, the state could complain to the FCC which already prohibits such activity.

For these reasons, Section 3's blanket prohibition against line item charges is substantially excessive in relation to the government's asserted interest.

### 3)      Conclusion.

For all these reasons, Section 3 violates the First Amendment.  Accordingly, the Defendants must be enjoined from enforcing it and the associated Penalty Provision.

**C.     Preemption.**

Plaintiffs also argue that Kentucky is preempted from enacting Section 3.  Because the Court has found Section 3 unconstitutional on other grounds, the Court declines to address the Plaintiffs' preemption argument.

The Court has determined that Section 3 violates the First Amendment and, therefore, the Defendants must be enjoined from enforcing it and the associated Penalty Provision.  The Plaintiffs also seek attorney's fees.  However, Plaintiffs are not entitled to recover attorney's fees associated with their preemption argument.  This is because Plaintiffs would be entitled to attorney's fees only pursuant to  42 U.S.C. § 1988 which provides, "[i]n any action or proceeding to enforce. . . [42 U.S.C. § 1983]... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.  Plaintiffs purport to bring their dormant Commerce Clause, First Amendment and preemption claims pursuant to 42 U.S.C. § 1983 which prohibits any person from acting under the color of state law to deprive any citizen of their constitutional or statutory rights.  A claim premised on a violation of the Supremacy Clause through preemption, however, is not cognizable under § 1983.  *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 792 (6th Cir. 1996); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989)("the Supremacy Clause, of its own force, does not create rights enforceable under § 1983"). *But cf. Dennis v. Higgins*, 498 U.S. 439, 446 (1991)(suits for violation of dormant Commerce Clause claim may be brought under § 1983).

Thus, the Court need not resolve the preemption issue to determine whether the Plaintiffs are entitled to attorney's fees or the amount of any such award.

**D.     Plaintiffs' Request for Attorney's Fees.**

In their Complaint and Motion for Summary Judgment, Plaintiffs also ask the Court to award them attorney's fees.  Attorneys' fees may be awarded to a plaintiff in a § 1983 action seeking injunctive or declaratory relief from a state or state officials acting in their official capacities. *Hutto v. Finney,* 437 U.S. 678 (1978). Such awards are not barred by the Eleventh Amendment because "Congress has plenary power to set aside the States' immunity from retroactive relief in order to enforce the Fourteenth Amendment." *Id.* at 693.  Congress has exercised that power by enacting § 1988 which makes attorneys' fees part of the costs which may be recovered by a prevailing plaintiff. *Id.* at 695.  Although *Will v. Michigan Dept. of State Police* precludes § 1983 suits against states or state officials acting in their official capacities for *money* damages or other forms of *retrospective* relief, it does not prohibit suits for injunctive or declaratory relief. 491 U.S. 58, 71 n. 10 (1989). Therefore, states are still subject to liability for attorneys' fees incurred by a plaintiff who succeeds on such claims. *Hutto,* 437 U.S. at 699-700.

With this Opinion and Order, the Court has determined that the Plaintiffs are entitled to judgment as a matter of law with regard to their First Amendment claim.  Accordingly, the Plaintiffs may be entitled to recover their attorney's fees as to that claim. If Plaintiffs seek to recover attorney's fees from the Defendants, they should file a motion in accordance with Federal Rule of Civil Procedure 54 and other applicable law including the Local Rules.

## IV.   CONCLUSION.

For the reasons discussed above, the Court will GRANT the Plaintiffs' Motion for Summary Judgment with regard to their claim that Section 3 violates the First Amendment. With regard to the Plaintiffs' dormant Commerce Clause claim, both parties agree that there are no issues of fact that must be resolved by a jury.  Further, for the reasons discussed above, the Court has determined that

28

Plaintiffs do not have standing to assert a dormant Commerce Clause claim on behalf of their out-of-state customers and that Section 3 does not violate the dormant Commerce Clause as a matter of law. Accordingly, the Court will enter final judgment in favor of the Defendants on the Plaintiffs' dormant Commerce Clause claim. Finally, the Court will deny as moot the Plaintiffs' Motion for Summary Judgment on their preemption claim, the Court having declined to address this issue.

Accordingly, the Court hereby ORDERS as follows:

1) The Defendants' Motion to Dismiss (Rec. No. 9) is DENIED;

2) The Plaintiffs' Motion for Preliminary Injunction (Rec. No. 5) is DENIED as moot;

3) The Plaintiffs' Motion for Summary Judgment (Rec. No. 19) is GRANTED in part and DENIED in part.

4) The Plaintiffs' Motion for Summary Judgment  (Rec. No. 19) on their First Amendment claim is GRANTED;

5) The Plaintiffs' Motion for Summary Judgment  (Rec. No. 19) on their preemption claim is DENIED as moot, the Court having declined to address this issue;

6) The Plaintiffs' Motion for Summary Judgment  (Rec. No. 19) on their dormant Commerce Clause claim is DENIED, the Court having determined that Plaintiffs do not have standing to assert a dormant Commerce Clause claim on behalf of their out-of-state customers and that Section 3 does not violate the dormant Commerce Clause;

7) Judgment shall be entered in favor of the Defendants on the Plaintiffs' claim that Section 3 violates the dormant Commerce Clause;

8) The Defendants are hereby ENJOINED from enforcing Section 3 and, therefore, the Penalty Provision; and

9)      This matter is stricken from the active docket of this Court.

Dated this 27th day of February, 2007.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**